FILED & JUDGMENT ENTERED
Christine F. Ramsey

October 28 2026

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

Ashley Austin Edwards
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>**Trent William Trias**,<br><br>Debtor. | Case No. 26-30602<br>Chapter 7 |

# ORDER GRANTING THE BANKRUPTCY ADMINISTRATOR'S MOTION TO DISMISS AND PERMITTING THE DEBTOR THIRTY DAYS TO CONVERT THE CASE

**THIS MATTER** is before the Court on the *Motion to Dismiss for Abuse Pursuant to 11 U.S.C. §§ 707(b)(1), (b)(2), and (b)(3)(B)* (the "Motion to Dismiss") [Doc. No. 18] filed by the United States Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator") on July 8, 2026. On September 9, 2026, the Debtor filed a *Response in Opposition to the Bankruptcy Administrator's Motion to Dismiss* [Doc. No. 27] with proposed amendments to Schedules I and J.[1] On September 14, 2026, the Debtor filed an *Amended Response in Opposition to the Bankruptcy Administrator's Motion to Dismiss* (the "Amended Response") [Doc. No. 29] with a *Cover Sheet for Amended Schedules and Statements* (the "Amended Schedules") [Doc. No. 30], which included all of the amended Schedules and Statements.

[1] The Debtor attached the proposed amendments as Exhibit A to the *Response in Opposition to the Bankruptcy Administrator's Motion to Dismiss* [Doc. No. 27].

The Court held a hearing on the Motion to Dismiss on September 16, 2026 (the "Hearing"). At the Hearing, Rashad Blossom appeared on behalf of the Debtor, and Heather W. Culp appeared on behalf of the Bankruptcy Administrator.[2] The Court took the matter under advisement and now renders its opinion. For the reasons set forth below, the Motion to Dismiss is **GRANTED**.

## I. BACKGROUND AND FACTUAL FINDINGS

1. On April 30, 2026 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code (the "Petition"). In the Petition, the Debtor listed his gross income as $124,118 in 2024, and $141,614 in 2025.[3] Petition at 36–37. On the Petition Date, the Debtor's gross income year-to-date for the 2026 calendar year was $45,760. *Id.* The Debtor is married and has two children, a daughter (age 10) and a son (age 5) (altogether the "Trias Family"). Petition at 33. The Debtor's debts are primarily consumer debts. Petition at 37. As of the Petition Date, the Trias Family's 2026 annualized income of $185,484[4] is above the median income of $116,737 for a household of four in North Carolina. Motion to Dismiss ¶ 9 (citing Debtor's Form 122A1, Question 13 [Doc. No. 1]).

2. On July 8, 2026, the Bankruptcy Administrator filed the Motion to Dismiss, which sought the dismissal of the Debtor's Chapter 7 case by arguing that (1) a presumption of abuse under 11 U.S.C. § 707(b)(1) and (b)(2) arises in this case because the Debtor's annual income is

[2] At the Hearing, both the Debtor and Bankruptcy Administrator entered exhibits into the record. The Debtor's Exhibits are designated throughout this opinion as "Debtor's Ex." followed by the exhibit number. The Bankruptcy Administrator's Exhibits are designated as "BA Ex." followed by the exhibit letter.

[3] Furthermore, Mrs. Trias testified that in 2024, the Trias Family's gross household income was around $180,000. Hr'g Tr., Sept. 16, 2026. She also testified that in 2025, prior to filing for bankruptcy, her income was $36,000, so if Mrs. Trias did not earn any income in 2025 after filing for bankruptcy, the Trias Family's gross household income was $177,000 in 2025. *Id.* Mrs. Trias was unsure of her income in 2025 after filing for bankruptcy. *Id.* While the gross household income year over year is not exactly clear, the Trias Family's gross household income in 2024 and 2025 appears to be close to $180,000.

[4] Form 122A1 in the Debtor's Petition lists the Debtor's monthly income as $11,182.17, Mrs. Trias's monthly income as $1,909.83, and the Debtor lists the Agency's monthly contributions to household income as $2,365. Altogether, Debtor's total monthly income is listed as $15,457.00.

above the median income for a household of four in North Carolina and the Debtor has not rebutted the presumption of abuse by alleging any alleged special circumstance,[5] and (2) the totality of the circumstances under 11 U.S.C. § 707(b)(3)(B) indicates abuse of the bankruptcy process, especially given the Debtor's high spending in the months preceding the Petition Date.[6] The presumption of abuse analysis in the Bankruptcy Administrator's Motion to Dismiss starts by correcting a monthly administrative expense deduction in the Debtor's favor, which decreases the Debtor's disposable income over 60 months from $43,006.20 to $27,672.60. Motion to Dismiss ¶ 10. Still, even after that adjustment in the Debtor's favor, the Bankruptcy Administrator asserts that a presumption of abuse arises. *Id.* In addition to the expenses that the Bankruptcy Administrator contends are frivolous, as discussed herein, to further reduce the Debtor's expenses, the Bankruptcy Administrator recommends that the Debtor shrink the monthly home mortgage payment through a loan modification and reduce the number of life insurance policies covering the Trias Family. Motion to Dismiss ¶ 12.

3. On September 14, 2026, the Debtor filed the Amended Response, which argues that two special circumstances rebut the presumption of abuse under 11 U.S.C. § 707(b)(2)(B): (1) the Debtor's spouse's business ceased paying all costs associated with the Debtor's vehicle and (2) the Debtor must now help in financially supporting his mother, who can no longer care for herself. Amended Response at 12–13.[7] The Debtor stipulated in the Amended Response and at the Hearing that the presumption of abuse under 11 U.S.C. § 707(b) exists in this case. *See* Amended Response at 6. The argument and testimony, therefore, focused on whether the Debtor could rebut the

[5] *See* Motion to Dismiss ¶ 13–14.
[6] *See* Motion to Dismiss ¶ 15, 18.
[7] The Amended Response also made two corrections to the Schedules in Debtor's favor—(1) a $388 monthly payroll deduction that the Debtor ceased post-petition and (2) duplicate homeowner's association dues listed in the Schedules—that, together, decreased the Debtor's expenses by $443 per month. Amended Response at 1; Petition at 34.

presumption of abuse pursuant to § 707(b)(2)(B), and alternatively, whether the totality of Debtor's circumstances demonstrated abuse pursuant to § 707(b)(3)(B). The Debtor and his spouse, Mrs. Jessica Trias ("Mrs. Trias"), both testified at the Hearing.

**A. Mrs. Trias's Bankruptcy**

4. Before the Debtor filed his Bankruptcy Petition, Mrs. Trias filed a Chapter 13 bankruptcy petition [Case No. 25-30892] ("Mrs. Trias's Bankruptcy") in this district on August 31, 2025, after her business started to struggle. The Court takes judicial notice of the docket and claims registers in both the Debtor's and Mrs. Trias's bankruptcy cases. Mrs. Trias owns an insurance agency, Jessica Trias Insurance and Financial Services, Inc. (the "Agency"), through which she sells insurance as a licensed agent on behalf of State Farm. *See Chapter 13 Petition* [Doc. No. 1], Mrs. Trias's Bankruptcy. In her bankruptcy schedules, Mrs. Trias listed the value of her assets as $252,981.50 and her liabilities as $747,659.00. *See* Official Form 106 Sum, Questions 1–3 [Doc. No. 19], Mrs. Trias's Bankruptcy. The schedules in Mrs. Trias's Bankruptcy valued the Agency at approximately $30,000, with approximately $138,000 in liabilities. Form 106 A/B, Question 19 [Doc. No. 19], Mrs. Trias's Bankruptcy. The claims register from Mrs. Trias's Bankruptcy indicated a claims total of $708,049.66, with $394,292.26 of that being debt secured by her home owned jointly with the Debtor (the "Mortgage").[8] *See* Claim No. 9, Mrs. Trias's Bankruptcy. As of the petition date in Mrs. Trias's Bankruptcy, American Express National Bank had filed one lawsuit against Mrs. Trias claiming $6,843.05 in unpaid credit card debt. Hr'g Tr., Sept. 16, 2026; Claim No. 7, Mrs. Trias's Bankruptcy.

[8] The Mortgage in Mrs. Trias's Bankruptcy also appears in the Debtor's case. The Mortgage is dated November 22, 2022, in the amount of $403,750.00 and was recorded on that same day in Book No. 5379, at Page 737 in the Register of Deeds in Gaston County, North Carolina. Debtor's Ex. 3.

5. In Mrs. Trias's Bankruptcy, her initial proposed Chapter 13 Plan provided for payments of $115 per month for sixty months but was never confirmed due to a lack of Certificate of Service. *See Chapter 13 Plan* [Doc. No. 17], Mrs. Trias's Bankruptcy; *Notice of Defective Entry or Filing* [Doc. No. 20], Mrs. Trias's Bankruptcy. On November 20, 2025, Mrs. Trias corrected that deficiency by filing a *Certificate of Service* [Doc. No. 23] and an *Amendment to Chapter 13 Plan* [Doc. No. 27]. The only change in the amended plan was an updated balance of the base fee owed to Mrs. Trias's attorney [Doc. No. 27]. On November 26, 2025, Mrs. Trias filed a *Second Amended Chapter 13 Plan* correcting the court division [Doc. No. 30], and the second amended plan was subsequently confirmed on December 24, 2025 [Doc. No. 38]. The Court's *Order Confirming Plan* [Doc. No. 38] approved the plan and increased plan payments from the proposed $115 per month to $120 per month for sixty months.

6. At the Hearing, Mrs. Trias testified that after filing for Chapter 13 bankruptcy, her income continued to decrease to the point that she contended that she could not pay back creditors as part of her Chapter 13 plan. Hr'g Tr., Sept. 16, 2026. The unfortunate decrease in her income was due to State Farm reducing its premium payouts to agents selling insurance policies. *Id.* At the Hearing, Mrs. Trias testified that she was unable to make plan payments, and therefore she converted her bankruptcy case to Chapter 7 on February 28, 2026. *See Notice of Conversion from Chapter 13 to Chapter 7* [Doc. No. 42], Mrs. Trias's Bankruptcy. Thereafter, on April 1, 2026, the Chapter 7 trustee in Mrs. Trias's bankruptcy case inquired into Mrs. Trias's finances and determined that "there is no property available for distribution over and above that exempted by law." *See Trustee's Report of No Distribution*, Mrs. Trias's Bankruptcy. Thus, the Chapter 7 trustee asked to be discharged and calculated that there was $747,659.00 in claims scheduled to be discharged without payment. *Id.* The trustee was subsequently discharged [Doc. No. 52], and Mrs.

Trias was discharged on June 3, 2026 [Doc. No. 54] with the case subsequently closed on June 5, 2026 [Doc. No. 55].

**B. Impact of Mrs. Trias's Business Income on the Trias Family's Finances**

7. Mrs. Trias testified at the Hearing that, as recently as the beginning of May 2026, the Agency did not have plans to close. Hr'g Tr., Sept. 16, 2026. However, in May 2026, State Farm announced another premium decrease and the elimination of a beneficial retirement savings program. *Id.* The next month, in June 2026, the Debtor and Mrs. Trias made the difficult decision to close the Agency, and Mrs. Trias opted in to the State Farm STEP program to cease operations by December 31, 2027. Debtor's Ex. at 9. Until the Agency is fully closed, Mrs. Trias may not act as a licensed insurance agent for another non-State Farm company, thereby restricting her professional opportunities. Hr'g Tr., Sept. 16, 2026.

8. Around the fall of 2025, the Trias Family fell behind on their Mortgage payments due to Mrs. Trias's reduced income following the Agency's financial difficulties. *Id.* Although the testimony at the Hearing was inexact, it appears that the Trias Family did not pay their Mortgage from the fall of 2025 through the summer of 2026. *Id.*; Debtor's Ex. 3; BA Ex. G. During this period, the Trias Family entered into two separate loan modifications with the lender—the first in the late fall of 2025 and the second on June 9, 2026—that reduced their mortgage payment by $520.01 per month. *Id.*; Amended Response at 3; Debtor's Ex. 3 (the "Loan Modification"). When the Debtor and Mrs. Trias executed the Loan Modification, they were behind on their Mortgage by at least $24,587.98, suggesting that even Mrs. Trias's ongoing bankruptcy did not provide enough breathing space for the Trias Family to pay the Mortgage. Debtor's Ex. 3 at 2; Hr'g Tr., Sept. 16, 2026. Pursuant to the Loan Modification, the Debtor's current Mortgage payment is

$2,848.99 per month with a total outstanding principal of $408,294.17. Debtor's Ex. 3 at 5; *see also* Amended Response at 6.

9. At the Hearing, the Debtor testified that he and his family have been struggling with debt for many years. *Id.* He testified that he hoped that the pay increase due to his job change in 2023 would help get the Trias Family out of debt, but that never happened. *Id.* Instead, the Agency struggled, and the Trias Family continued to accumulate a mounting debt load. *Id.* The Debtor testified that prior to filing for bankruptcy, the Debtor and Mrs. Trias tried measures like scheduling weekly budget meetings, but "by then the hole was too deep." *Id.* In May 2023, the Debtor took out a State Farm Federal Credit Union loan (the "State Farm Loan") in an attempt to pay off debt. *Id.* He made nine out of sixty payments before ceasing payment on the State Farm Loan after October 27, 2024, leaving a balance of $33,228.49 outstanding as of the Petition Date. *Id.*; Claim No. 3 at 2.

10. The Debtor testified that the Trias Family generally stopped paying any unsecured creditors, including Mrs. Trias's student loans, in the fall of 2024, contending that they could not afford to repay the debts. Hr'g Tr., Sept. 16, 2026. The Debtor also owes $70,418.34 on his own student loans and has not made a payment since Mrs. Trias's Bankruptcy in August 2025. *Id.*; Claim No. 4 at 2. In December 2025, the Debtor borrowed $15,000 against his 401(k) retirement account to help pay some of the Trias Family's debts. *Id.*; BA Ex. C. As of May 26, 2026, the Debtor owes a remaining balance of $13,630.40 on that 401(k) retirement loan. *Id.* Before the Petition Date, American Express National Bank, JPMorgan Chase Bank, and Synchrony Bank had each filed a lawsuit against the Debtor to demand payment for unpaid credit card debt.[9] Additionally, as the Bankruptcy Administrator pointed out, the Debtor had not paid his attorney in

[9] In the Petition, the Debtor disclosed three lawsuits filed against him in 2025 that remained pending on the Petition Date. Debtor's Official Form 107, Question 9 [Doc. No. 1].

full prior to filing for bankruptcy and, as of the Petition Date, owed Mr. Blossom $1,520 in attorney fees. Hr'g Tr., Sept. 16, 2026.

**a. The Debtor's and Mrs. Trias's Vehicles**

11. In addition to Mrs. Trias's income decreasing, the Trias Family incurred additional expenses as a result of the Agency's decreased ability to contribute to household expenses given its status as a "failing business." Amended Response at 13. Historically, the Agency paid the leases for both of the Trias Family's vehicles[10] and contributed $2,365 per month to household expenses, inclusive of all vehicle expenses, phone services, and home internet for the Trias Family (and, in some cases, the extended family as discussed herein). *See* Amended Response at 11–12. The Agency continues to pay for the phone services and home internet for the Trias Family but does not pay for both vehicles anymore. *Id.* at 7, 11. When both vehicle leases ended, the Agency only continued to pay the lease and other related costs for Mrs. Trias's vehicle. *Id.*; Hr'g Tr., Sept. 16, 2026. Mrs. Trias's testified that her lease expired in April 2026, prior to the Petition Date, and she returned that car to the dealership upon the expiration of the lease. Hr'g Tr., Sept. 16, 2026; Debtor's Ex. 5. In June 2026, two days after receiving the discharge in her Chapter 7 bankruptcy case, Mrs. Trias took out a loan to purchase a used 2023 Jeep Grand Cherokee (the "Jeep") with 36,310 miles on it. Hr'g Tr., Sept. 16, 2026; Debtor's Ex. 5. Mrs. Trias purchased the Jeep for a total sale price of $65,764.66, which included her downpayment of $1,590, the amount financed of $46,925.40, and the finance charge of $17,249.26. Debtor's Ex. 5. The Jeep loan has an annual percentage rate of 10.49%. *Id.* Payments on the Jeep loan began in July 2026 at a rate of $856 per month for seventy-four months with one final payment of $830.66. *Id.*; Amended Response at 4. The Agency pays the full $856 per month vehicle payment, as well as other costs associated with

[10] Prior to the expiration of the leases, Mrs. Trias drove a 2022 Jeep Grand Cherokee, and the Debtor drove a 2023 Chevy Silverado 1500. Hr'g Tr., Sept. 16, 2026; Debtor's Ex. 4.

the Jeep including insurance, maintenance, and fuel, totaling $1,267 per month. Amended Response at 7.

12. Prior to Petition Date, the Agency also paid for the Debtor's vehicle, which was used for Agency business as well as personal use. Amended Response at 20–21. The Agency had been paying $1,045 per month for the vehicle, a 2023 Chevy Silverado 1500 (the "Silverado"), which included a $786 lease payment and additional operating expenses. *Id.* Following the Trias Family's decision to wind down the Agency, the Debtor no longer uses the Silverado for Agency purposes, and the Agency can no longer afford to pay for it. Hr'g Tr., Sept. 16, 2026. Thus, the Agency stopped paying for the Silverado when the lease expired three to four months after the Petition Date. *Id.*; *See* Debtor's Schedule J, Question 24 [Doc. No. 1]. As a result, thereafter, the Debtor contends that the Agency was contributing $607 less per month to household expenses as of the Petition Date than it did from October 2025 through March 2026 (the "Lookback Period"). *See* Amended Response at 11–12. When the Silverado lease ended, the Debtor was over the allowed milage, and Mrs. Trias took out a loan to purchase the Silverado on July 27, 2026, for a total sales price of $80,953.08. Debtor's Ex. 4. Mrs. Trias did not make a downpayment on the Silverado, and the total sales price included an amount financed of $55,762.71 and a finance charge of $25,190.37. *Id.* The Silverado loan has an annual percentage rate of 11.99%, and payments began in September 2026 at $1,037.86 per month for seventy-eight months. *Id.* Mrs. Trias testified that the Trias family made the first loan payment on September 11, 2026. Hr'g Tr., Sept. 16, 2026. When Mrs. Trias bought out the lease, the monthly payment for the Silverado increased from $786 per month for the lease to $1,037.86 per month for the loan and went from being paid by the Agency to becoming a direct obligation of the Trias Family. *Id.* Although the purchase agreement, Debtor's Exhibit 4, lists the monthly Silverado payments as $1,037.86, the Debtor asserts in his

Amended Schedules and Amended Response that the Silverado monthly payment is $1,032 per month. Amended Schedules at 8; Amended Response at 21.

13. The Debtor testified that he uses the Silverado's truck bed occasionally for work, but that a pickup truck is not a condition of his employment. Hr'g Tr., Sept. 16, 2026. When the Bankruptcy Administrator asked at the Hearing why the Debtor decided to not just discharge the lease when filing for bankruptcy, the Debtor stated, "[t]o be honest, the option never even crossed my mind." *Id.* Furthermore, the Debtor testified that the Trias Family "needed a vehicle, and it was something that [they] already had, so why get rid of it and try to finance another vehicle while being in bankruptcy." *Id.*

**b. The Phone and Internet Services**

14. While the Agency no longer pays for the Debtor's Silverado, it continues to pay for the Trias Family's phone and internet service from Verizon. *Id.* Verizon's claim in the claims registry of Mrs. Trias's Bankruptcy (the "Verizon Claim") demonstrates that the Trias Family pays for the phone services of their extended family, including the Debtor's mother and Mrs. Trias's mother and father. Claim No. 12 at 1, Mrs. Trias's Bankruptcy. The Verizon Claim details the Trias Family's monthly phone bills from July 17, 2025, to October 16, 2025, which fluctuated between $618.22 for the one-month period from July 17, 2025, to August 16, 2025, to $639.49 for the one-month period from September 17, 2025, to October 16, 2025. *Id.* Mrs. Trias testified at the Hearing that the cost of the monthly phone bill has not significantly changed since October 2025, but that they have upgraded devices since then. Hr'g Tr., Sept. 16, 2026. As of the date of the Verizon Claim, Mrs. Trias's personal devices included two Apple iPhone 16 Pro Maxes, an Apple iPad, and an Apple Watch Ultra, all of which were financed on credit. Claim No. 12 at 33–35, 40,

43, Mrs. Trias's Bankruptcy.[11] The Debtor's personal devices included an Apple iPhone 16 Pro Max and an Apple Watch Series 7, both of which were financed on credit. *Id.* at 37–38. The Trias's two children each had an Apple iPad, while one also had a Gizmo watch and the other had an Apple iPhone 12 which were all financed on credit. *Id.* at 41–43. *Id.* In addition to their nuclear family, Mrs. Trias's father had an Apple iPhone 16 Pro Max on the Trias Family Verizon plan that was financed on credit. *Id.* at 39. Additionally, the Debtor's mother had an Apple iPhone 12 Pro Max and an Apple Watch Series 4 covered under the Trias Family Verizon plan. *Id.* at 36–37. As of October 2025, the Trias Family owed Verizon $5,319.99 on their various devices and those of their extended family. *Id.* at 34–43. While the Agency currently pays the Verizon bill, once the Agency ceases operations, the Agency will no longer be able to pay for the Trias Family's internet and phone services. Hr'g Tr., Sept. 16, 2026; Debtor's Ex. at 9

**C. The Grandmother's Health**

15. At the Hearing, Mrs. Trias testified that the health of Debtor's mother, Tracey Trias (the "Grandmother"), is declining and has acutely worsened since August 2026. Hr'g Tr., Sept. 16, 2026. The Grandmother is seventy-four-years-old and suffering from dementia that has slowly been getting worse over time. *Id.* Mrs. Trias witnessed this decline on a daily basis as the Grandmother worked at the Agency with Mrs. Trias. *Id.* In August 2026, the Grandmother had a seizure while working at the Agency, and since then, she has needed help managing her health and taking care of her daily needs. *Id.* For the past two months, since August 2026, the Debtor and Mrs. Trias contend that they have been helping the Grandmother financially by spending around $500 per month on her expenses, such as groceries. *Id.*; Debtor's Ex. 11. A tracker of the Grandmother's monthly income and bills from September 2026 lists the Grandmother's monthly

[11] Mrs. Trias testified that her iPad and one of her iPhones were work devices. Hr'g Tr., Sept. 16, 2026.

income as $4,979.60 and her monthly expenses as $5,080.85. Debtor's Ex. 13. The Grandmother's expenses included her monthly electricity bill ($208.82), water bill ($136.61), and her mortgage payment ($2,151.85), but not other living expenses like food. *Id.* Notably, her expenses include monthly payments on various debts. *Id.* Excluding the Grandmother's monthly water and electricity expenses, she spent $4,735.42 on debt service in September 2026. *Id.* The Grandmother's various unsecured consumer debts account for $947.04 of her expenses every month, and as of September 2026, she owed a total of $20,332.50 to her unsecured creditors. *Id.* Over half of her unsecured debt is credit card debt, with the highest balance on a Capital One credit card totaling $13,010.10. *Id.*

**D. Life Insurance**

16. The Trias Family owns numerous life insurance policies that operate as estate planning and savings devices. Specifically, the Trias Family currently has six life insurance policies, three of which insure the Debtor. Debtor's Ex. 8. The policy ending in 5351 is a joint policy for Mr. and Mrs. Trias, and the policies ending in 9180 and 3687 are the Debtor's policies, with the former policy being the Debtor's only term policy. *Id.* As seen in the Debtor's Exhibit 8, the Trias Family terminated two of their life insurance policies in December 2025, which had covered their children (with one policy covering each child). *Id.* Mrs. Trias testified at the Hearing that she "essentially [has] some of these policies in place to help offset the fact that [she doesn't] have a retirement" (referencing her 401k account with only $1,000 in it). Hr'g Tr., Sept. 16, 2026. Mrs. Trias further testified that "[m]ost of these [policies] are estate and financial planning, really, for our children and ourselves." *Id.* The Trias Family does not plan to liquidate any more of their insurance policies because they would lose thousands in accrued value if they did so. *Id.* In total,

the Trias Family pays $807 per month towards life insurance premiums.[12] *Id.* In addition to the numerous life insurance policies, the Debtor also has a 401k account for retirement planning. Debtor's Ex. 1 at 1. From the start of calendar year 2026 through to the Petition Date, the Debtor had contributed $1,211.57 to his 401k and $915.24 to his Roth 401k. *Id.* The Debtor's Amended Schedules show a monthly voluntary retirement contribution of $447. Amended Schedules at 5.

**E. Travel**

17. Leading up to the Petition Date, the Trias Family traveled considerably. BA Ex. D. In total the Trias Family spent $7,569.73 on travel during the Lookback Period. *Id.* As discussed above, Mrs. Trias filed for bankruptcy on August 31, 2025, and received a discharge on June 3, 2026. [Doc. Nos. 1 & 54], Mrs. Trias's Bankruptcy. In the midst of Mrs. Trias's bankruptcy, the Debtor filed his Petition on April 30, 2026. *See id.*; Petition. The chart below lists the Trias Family's travels during the Debtor's six-month Lookback Period, which ran from October 2025 through March 2026:

| Date | Trip Location | Amount Spent |
| --- | --- | --- |
| October 2025 | Charleston, SC | $512.09 |
| November 2025 | Caribbean cruise | $2,877.39 (final payment) |
| December 2025 | Charleston, SC | $398.28 |
| March 2026 | Charleston, SC | $1,227.35 |
| March 2026 | Outer Banks, NC | $1,041.03 |

BA Ex. D. The total amount spent on the Caribbean cruise in November 2025 is certainly higher than the $2,877.39 listed in the chart because Mrs. Trias testified at the Hearing that she paid two

[12] The Amended Schedules and Amended Response list the monthly payment as $837, but Mrs. Trias testified that the "normal" monthly payment towards life insurance is $807. Hr'g Tr., Sept. 16, 2026.

non-refundable downpayments on the cruise prior to the start of the Lookback Period. Hr'g Tr., Sept. 16, 2026. Mrs. Trias testified that the Trias Family paid a nonrefundable downpayment of $1,250 on the cruise in May 2025. *Id.* Then, Mrs. Trias paid another nonrefundable downpayment of over $3,000 for the cruise in August 2025, the same month she filed for bankruptcy herself. *Id.*[13] In addition to the $4,550 in downpayments, the Trias Family spent a further $2,877.39 on the cruise and related travel expenses in November 2025, bringing the cruise trip total to more than $7,427.39 and possibly as high as $8,227.39. *Id.*; BA Ex. D. Because the downpayments predated October 2025, those expenses were not included in the total travel expenses calculation for the Lookback Period.

18. In addition to the family trips, between November 2025 and January 2026, the Debtor traveled to Kentucky for work and spent a total of $831.98 on non-reimbursed personal shopping. BA Ex. D. The Debtor also spent $293.42 on a personal trip to Tampa, Florida. *Id.* In total, the Trias Family spent $7,569.73 on travel during the six-month Lookback Period, and this figure does not even include the full amount for the cruise or trips after March 2026, like the family's trip to Charleston in April 2026 to celebrate Mrs. Trias's birthday and explore Charleston as a possible place to move to in the future. *Id.*; Hr'g Tr., Sept. 16, 2026.

**F. Additional Expenses**

19. In addition to their high spending on travel, the Trias Family averaged $1,266.25 in monthly dining out expenses during the Lookback Period. BA Ex. D. In March 2026, the same month as the Outer Banks trip, their dining out charges totaled $2,356.81. Additionally, during the Lookback Period, the Trias Family spent an average of $895.62 per month on groceries (though Mrs. Trias testified that this number also included gas). BA Ex. I. Combining these numbers, the

[13] Mrs. Trias testified that this nonrefundable downpayment was over $3,000, but that she was unsure if it was $3,200 or $3,800. *Id.*

Trias Family's monthly food budget averaged $2,161.87 per month during the Lookback Period (with the caveat that the number includes gas payments). A typical day for the Trias Family included numerous trips to restaurants or fast-food establishments, and their average dining out spending was $76.02 per day over the entire Lookback Period.[14] BA Ex. D. Furthermore, their monthly spending on Starbucks averaged $123.21 during the Lookback Period. *Id.*

20. At the Hearing, Mrs. Trias and the Debtor further testified to even more discretionary spending. Hr'g Tr., Sept. 16, 2026. For example, in the past year the Trias Family spent $160 each month on Massage Envy memberships (one for the Debtor and one for Mrs. Trias). BA Ex. D. Beyond the travel expenditures, the Trias Family's recreational spending during the Lookback Period averaged $333.17 per month and included trips to Carowinds and the Whitewater Rafting Center. *Id.* During the Lookback Period, the Trias Family spent an average of $2,187.97 per month on additional shopping (which likely also encompassed some household expenses). *Id.*; Hr'g Tr., Sept. 16, 2026.

21. A comparison of the Trias Family's spending during the Lookback Period and as of the Hearing, five months later, reveals that the Trias Family has not significantly cut back on its spending habits. In August 2026, the Trias Family's expenses were $5,113.17 and included: $2,199.98 on dining out,[15] $312.58 on personal services, $778.97 on recreation, and $1,351.91 on shopping. BA Ex. E. On a recent trip in August 2026 to pick up her children who had been visiting

[14] For example, on March 30, 2026, the Trias Family incurred the following dining out charges: RayNathans ($58.13), Starbucks ($40.00), The Everyday Market ($20.31), Zaxby's ($22.64), Arby's ($11.09), and McDonald's ($23.60). BA Ex. D. While March 30, 2026, was an above average day for spending, these were the types of dining out charges typical of the entire Lookback Period (both in terms of the frequency at which the Trias Family dined out, as well as the kinds of dining establishments frequented). *Id.*

[15] This number reflects the amount that the family spent after the Bankruptcy Administrator subtracted the Grandmother's expenses, which included food from Marco's Pizza, food delivery from Uber Eats, and groceries from Publix. Debtor's Ex. 11. Therefore, these numbers only reflect the family of four's spending. *Id.* As an extravagant example of the Trias Family's spending, the family paid for seafood delivery from Wild Alaskan Company in August 2026. Hr'g Tr., Sept. 16, 2026.

their grandparents in Savannah, Georgia, Mrs. Trias spent a total of $469.73, which included $209.95 for treatments at a day spa for herself. *Id.*; BA Ex. E.

**G. Looking Forward**

22. At the Hearing, the Bankruptcy Administrator asked the Debtor directly, "Do you honestly believe sitting here today under penalty of perjury that you have done the best that you can do over the last several months?" Hr'g Tr., Sept. 16, 2026. The Debtor responded, "Best we can do? Definitely not. Are we working on it? Of course." *Id.* He went on to state that he "wouldn't be here if [he] could have done everything right." *Id.* Furthermore, Mrs. Trias testified that they "are trying to do better" with their spending, but "it's definitely a work in progress." Hr'g Tr., Sept. 16, 2026.

23. However, the Trias Family's spending has not decreased by any significant amount following the Petition Date, and their expenses continue to exceed their income even though the Trias Family's gross income in August 2026 alone was $13,410.02.[16] BA Ex. G. While Mrs. Trias characterized their income in August as "unusual" due the quarterly bonus, the Debtor's income has been increasing year over year, with $124,118 in 2024 gross income and $141,614 in 2025 gross income. *See* Hr'g Tr., Sept. 16, 2026; Debtor's Official Form 107, Question 4 [Doc. No. 1]. Furthermore, the Trias Family's projected gross household income for 2026 is $185,484, inclusive of $134,186.04 derived from the Debtor's income. *See* Motion to Dismiss ¶ 9; Debtor's Official Form 107, Question 4 [Doc. No. 1].

24. Following negotiations between the Trustee and the Debtor after the 341 meeting, the Trustee filed a *Motion to Approve Settlement* [Doc. No. 11] (the "Motion to Approve

[16] The Trias Family's gross income for August 2026 included the Debtor's quarterly commissions, and Mrs. Trias testified that as a result, the Debtor's income for August 2026 was not reflective of what the Debtor receives every month. Hr'g Tr., Sept. 16, 2026.

Settlement") on June 3, 2026, which settled the Debtor and Trustee's dispute about the turnover of assets.[17] Due to account restrictions on assets that prevented full liquidation, the Trustee negotiated with the Debtor, and the Trias Family agreed to a $10,000 payment to the Trustee. Motion to Approve Settlement at 2. Notably, a Court order has not been entered on the Motion to Approval Settlement however, Mr. Blossom, the Debtor's counsel, is currently holding $10,000 in a trust account as a result of such negotiations (the "$10,000").

## II. DISCUSSION

25. Dismissal of a debtor's Chapter 7 case is appropriate when the debts are "primarily consumer debts," and the court "finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. 707(b)(1). Under Chapter 7, the two methods for determining abuse are (1) whether under § 707(b)(2), the presumption of abuse arises, and if it does, whether special circumstances rebut the presumption under § 707(b)(2)(B) and (2) whether under § 707(b)(3), the totality of the circumstances indicates that the case is an abuse of Chapter 7. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA)[18] updated 11 U.S.C. § 707(b) in response to Congress's concerns that debtors were abusing Chapter 7 of the Bankruptcy Code. *See McDow v. Dudley*, 662 F.3d 284, 288 (4th Cir. 2011). BAPCPA revised section 707(b) in various ways, "including lowering the threshold for dismissal from 'substantial abuse' to 'abuse'; adding the means test; and, replacing a statutory presumption in favor of a debtor's discharge with the presumption against debtors who fail the means test." *Malloy v. Broscious*, No. 3:25CV780, 2026 WL 2909529, at *7 (E.D. Va. Sept. 28, 2026) (citing *McDow*, 662 F.3d at 288; *In re Sonntag*, No.

---

[17] The Motion to Approve Settlement indicated that two accounts listed on the Debtor's Schedules as of the Petition Date contained non-exempt equity: a Truist savings account and a Fidelity brokerage account. Motion to Approve Settlement at 1. The non-exempt equity totaled $14,305.50, with $655.00 of that value from the Truist account, and $13,650.50 of the value from the Fidelity account. *Id.*

[18] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 442(a), 119 Stat. 23, 115-16.

10-1749, 2012 WL 1065482, at *2 (Bankr. N.D.W. Va. Mar. 28, 2012); 6 COLLIER ON BANKRUPTCY ¶ 707.04[1] (16th ed. 2026) (describing BAPCPA's modifications to § 707(b))). Thus, Congress created the means test (the "Means Test") with the intention of preventing abuse of the Chapter 7 bankruptcy process. *McDow*, 662 F.3d at 288.

26. In addition to creating a threshold at which the presumption of abuse arises, BAPCPA "mandates that [the debtor] pass a second test of abuse by including in § 707(b)(3) the Fourth Circuit's 'totality of the circumstances' test." *In re Siler*, 426 B.R. 167, 177 (Bankr. W.D.N.C. 2010) (citing *In re Nockerts*, 357 B.R. 497, 505 (Bankr. E.D. Wis. 2006)). Thus, section 707(b)(3) states that when considering whether abuse "does not arise or is rebutted, the court shall consider . . . (B) the totality of the circumstances." 11 U.S.C. § 707(b)(3).

**A. Presumption of Abuse and Special Circumstances**

**1. Presumption of Abuse**

27. To assess the Means Test pursuant to 11 U.S.C. § 707(b) and for a court to determine "whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists" when the "debtor's current monthly income . . . multiplied by 60 is not less than the lesser of-- (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $10,275 . . . , whichever is greater; or (II) $17,150."[19] 11 U.S.C. § 707(b). If the debtor's monthly income multiplied by sixty falls above that limit, then the presumption of abuse arises.

[19] The Debtor's household monthly disposable income over 60 months, after deducting certain expenses and secured debt payments allowed under the Bankruptcy Code, is $43,006.20. Debtor's Form 122A-2, Question 40 [Doc. No. 1]. The presumption then arises in this case because $43,006.20 is greater than $17,150. Furthermore, the presumption of abuse still arises even after the Bankruptcy Administrator's correction of a deduction for administrative expense which brings the Debtor's household monthly disposable income over 60 months to $27,672.60. Motion to Dismiss ¶ 10(a). After the Debtor's corrections, the Debtor calculated the Debtor's household monthly disposable income over 60 months to be $35,428.80. Amended Response at 14–15. In all of these instances, the Debtor's household monthly disposable income over 60 months far exceeds $17,150, and the Debtor stipulated in the Amended Response and at the Hearing that the presumption of abuse under 11 U.S.C. § 707(b) exists in this case. *See id.* at 6.

*Id.* Throughout the § 707(b) analysis, "the party seeking a determination that a case is abusive bears the burden of proof," but once "a prima facie case of abuse has been established," then the "burden is on the Debtor to rebut and to shift the ultimate burden of proof back to the moving party." *In re Clark*, 680 B.R. 60, 2025 Bankr. LEXIS 3109, at *21 (Bankr. E.D.N.C. 2025) (first citing then twice quoting *In re Williams*, 424 B.R. 207, 210–11 (Bankr. W.D. Va. 2010)).

28. Once the presumption of abuse arises, 11 U.S.C. § 707(b)(2)(B) provides that it "may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces . . . that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." § 707(b)(2)(B)(i). While the Bankruptcy Code does not provide a specific definition of special circumstances, "[t]he similarity in nature of the two examples is that they are life circumstances that directly and unavoidably affect one's earning capacity or give rise to necessary, additional expenses." *In re Smith*, 388 B.R. 885, 888 (Bankr. C.D. Ill. 2008). For an example of a special circumstance beyond those listed in the statute, the Debtor cites to *In re Littman*, 370 B.R. 820 (Bankr. D. Idaho 2007), in which a bankruptcy court "allowed a postpetition child-support obligation as a special circumstance after a fact-specific inquiry." Amended Response at 11. The bankruptcy court in *Littman* found the special circumstance to be valid under 11 U.S.C. § 707(b)(2)(B) because it determined the underlying obligation was present on the petition date. *Id.* at 829–32.

29. Ultimately, to rebut the presumption of abuse, the expense in question must be necessary and reasonable to the extent that "there is no reasonable alternative other than the payment of expense." *See In re Hammock,* 436 B.R. 343, 354 (Bankr. E.D.N.C. 2010) (citing *In re Siler*, 426 B.R. at 172). Thus, "it seems clear that Congress intended 'to set this bar extremely

high, placing it effectively off limits for most debtors.'" *In re Parulan*, 387 B.R. 168, 172 (Bankr. E.D. Va. 2008) (quoting *In re Haar*, 360 B.R. 759, 760 (Bankr. N.D. Ohio 2007)). Because the reasonable alternative standard is a high bar, a debtor must "fully investigate[] other alternative options" for an expense to be reasonable. *In re Davis*, Case No. 25-30339, 2025 WL 2627775, at *4 (Bankr. W.D.N.C. Sept. 11, 2025) (holding that a child's private school tuition did not qualify as a special circumstance even though the child had special needs because public schools are required to provide education to students with disabilities, and the mother-debtor did not "fully investigate[]" public school options).

30. The Debtor acknowledges that the presumption of abuses arises in this case. Thus, the Debtor must rebut the presumption by demonstrating special circumstances pursuant to 11 U.S.C. § 707(b)(2)(B). The Debtor argues two special circumstances: (1) reduced contributions from the Agency related to the payment of the Debtor's Silverado expenses and (2) the declining health of the Debtor's mother, which caused the Debtor to contribute to her living expenses. Amended Response at 6–8. Like the debtor in *Littman*, the Debtor argues that "the adjustment proposed here is a loss of actual household income/support, not a reclassification of voluntary saving" given the discontinuation of the Agency's monthly Silverado payments and the high likelihood of future reductions in the Agency's ability to pay for the Trias Family's expenses. *See* Amended Response at 11.[20]

**2. Rebutting the Presumption and Special Circumstances**

**i. The First Special Circumstance: Lost Agency Contributions**

31. The Debtor's first asserted special circumstance concerns the reduced ability of the Agency to contribute to household expenses given that the Agency "has operated at or near a loss

[20] The Debtor also argues that a special circumstance is not only reserved for involuntary expenses. *See In re Haman*, 366 B.R. 307, 312–18 (Bankr. D. Del. 2007).

for an extended period." Amended Response at 12. The Agency currently pays for Mrs. Trias's vehicle, the Jeep, in the amount of $1,267 per month,[21] as well as for the Trias Family's phone services and internet bill in the amount of $491 per month. Amended Response at 7. The Agency previously paid for the lease for the Debtor's Silverado, in the amount of $786, as well as its operating expenses, resulting in a total payment of $1,045 per month, but the Agency no longer has the funds to do so. Amended Response at 20. The Debtor contends that as of the Hearing Date, the amount that the Agency covers for the Trias Family's household expenses has permanently decreased from $2,365 per month to $1,758 per month as a result of the Agency no longer paying for the Silverado's lease and operating expenses. Amended Response at 11–12. That amounts to a reduction of $607 per month in assistance from the Agency, and the Debtor argues that the reduction in Agency contributions should be measured by that reduction. *Id.* However, the Court believes that the permanent cessation in Agency payment towards the Silverado amounts to a greater reduction than $607. The Agency has ceased to contribute any funds towards the Silverado, and the Trias Family is now responsible for the operating costs of the Silverado, which were $259 per month when the Agency was paying for all costs associated with the Silverado. Amended Response at 20–21. At the same time, the Debtor's Silverado payment rose from $786 per month under the lease to $1,037.86 per month under the loan.[22] The total reduction in Agency contribution should then be measured by the full cost the Trias Family must incur every month for the Silverado, which totals $1,296.86 (assuming operating costs of $259 per month).Pursuant to § 707(b)(2)(B) and the special circumstances analysis, the Court first addresses the "reasonableness" and

[21] The $1,267 per month includes the vehicle payment of $856 and operating expenses. Amended Response at 7.
[22] The Debtor asserts in his Amended Schedules and Amended Response that the Silverado monthly payment is $1,032 per month. Amended Schedules at 8; Amended Response at 21. The purchase agreement, Debtor's Exhibit 4, lists the monthly Silverado payments as $1,037.86. Because these numbers are $5.86 apart, the analysis does not change no matter which number is the most accurate, and for the sake of this analysis, the Court utilizes the monthly Silverado payment listed in the purchase agreement.

"necessity" of the Silverado expenses. While there is no doubt that a vehicle is reasonable and necessary for the Debtor to commute to work and support the family, and the Court certainly does not mandate that a family of four may only possess one vehicle, it is less clear that this exact vehicle is reasonable and necessary under the Debtor's circumstances. The Court is concerned with rising vehicle expenses after Mrs. Trias bought out the lease on the Silverado while the Debtor was in bankruptcy, which, despite being the same vehicle, increased the monthly lease payment from $786 to $1,037.86 at the time when the Trias Family knew the Agency would no longer pay for the Silverado expenses. Amended Response at 20–21.

32. The Court finds some merit in the Debtor's argument about the difficulty of obtaining a vehicle loan with a low interest rate while in bankruptcy. However, at the Hearing, the Debtor testified that even though the total sales price was $80,953.08, he did not even consider buying a different vehicle because he was already accustomed to the Silverado. The Debtor also testified that a pick-up truck is not necessary to his employment, and he knew that the Agency would not continue paying for Debtor's vehicle at the time of purchase. The Debtor chose the increased car payment without considering other options despite the requirement of 11 U.S.C. § 707(b)(2)(B) to consider and investigate reasonable alternatives in order to qualify as a special circumstance. *See In re Davis*, 2025 WL 2627775, at *4. And as of the Petition Date, the Debtor presumably knew that he would be obligated to corroborate a special circumstance by making reasonable financial decisions because he checked the box on Official Form 122A-1 identifying the necessity of a Means Test due to the presumption of abuse under § 707. *See* Debtor's Official Form 122A-1, Question 14 [Doc. No. 1]. Ultimately, the Court finds that while the Debtor needs a vehicle, it was not reasonable or necessary for the Debtor to purchase the Silverado without

considering other options, and therefore, this expense does not qualify as a "special circumstance" pursuant to § 707(b)(2)(B).

**ii. The Second Special Circumstance: Grandmother's Health**

33. The Debtor claims a second special circumstance: the expenses related to the declining health of the Debtor's mother, the Grandmother; specifically, the Trias Family paid for Grandmother's groceries, food, and personal care in August and September 2026.[23] The Court heard extensive testimony at the Hearing that the Grandmother needs assistance with daily activities like preparing food and taking her medicine. The Court commends the Trias Family's commitment to caring for her. The Court also recognizes that serious illness is one of the special circumstances listed in section 707(b)(2)(B). Furthermore, a $500 per month contribution for groceries and food on its face appears to be quite reasonable due to the Grandmother's struggles to provide for herself, particularly in conjunction with her worsening dementia and the seizure she had in August 2026.

34. However, the Bankruptcy Administrator prudently points out that the $500 monthly contribution to the Grandmother is, in essence, paying the Grandmother's unsecured creditors. The Grandmother appears to be using almost half of her monthly income to pay her own unsecured debt and does not have sufficient funds for living expenses *after* she pays all of her monthly debt payments. While the Debtor has the best of intentions in caring for his ailing mother, the Debtor's proposal to pay $500 per month towards the Grandmother's expenses is essentially equivalent to paying the Grandmother's unsecured creditors at the expense of his own. As of the filing of Debtor's Exhibit 13, the Grandmother had a monthly income of $4,979.60. The Grandmother's

---

[23] In August 2026, the Trias Family contributed $639.36 to the Grandmother's living expenses, which included food, groceries, and a salon service. BA Ex. G. In September 2026, the Trias Family contributed $118.83 to the Grandmother's living expenses from September 1, 2026, to September 8, 2026. BA Ex. G. These numbers are also reflected in Debtor's Ex. 11, which contains the same information as BA Ex. G.

living expenses include an electricity bill (which was $208.82 in September 2026), a water bill (which was $136.61 in September 2026), and a monthly mortgage payment ($2,151.85). Debtor's Ex. 13. The Trias Family proposes to contribute $500 on top of this amount for food and personal care, bringing the Grandmother's total living expenses to $2,997.28 per month. If the Grandmother only paid for those living expenses, then she would be left with $1,982.32 per month. While 11 U.S.C. § 707(b) may, in many cases, consider contributions to an ailing family member for living expenses to be a special circumstance, and the Court agrees the Grandmother's health has been in decline prior to the Petition Date, the Debtor here is essentially proposing that he pay $500 per month to the Grandmother's unsecured creditors to the detriment of his own unsecured creditors. The Court admires how much the Debtor and Mrs. Trias do for Grandmother, but Congress did not intend the special circumstances exception under 11 U.S.C. § 707(b) to allow debtors to help family members pay their own unsecured debts while failing to pay their own debts.

35. Therefore, the Court finds that the $500 monthly contribution to Grandmother does not qualify as a special circumstance that can rebut the presumption of abuse under 11 U.S.C. § 707(b). In conclusion, the Debtor argues that two special circumstances fall under 11 U.S.C. § 707(b)(2)(B) and rebut the presumption of abuse in this case: (1) the Agency's reduced contributions related to the payment of the Debtor's Silverado expenses and (2) the Debtor's financial support of the Grandmother's living expenses due to her declining health. On their face and based upon solely the pleadings, these special circumstances might have sufficed to rebut the presumption of abuse; however, the facts uncovered at the Hearing demonstrated otherwise. At the Hearing, the Debtor failed to establish that the Debtor explored reasonable alternatives before purchasing the Silverado for total sales price of $80,953.08. Further, what at first glance appears like two months of contributions to the obligatory living expenses of an ailing Grandmother, is, in

actuality, the Debtor paying the unsecured debts of a family member. Still, even if the presumption of abuse is not rebutted, the Debtor asserts that this Court has previously recognized a narrow exception that allows such cases to continue under Chapter 7 in certain circumstances. *See In re Siler*, 426 B.R. at 176–78.

**3. *Siler* Analysis**

36. The Debtor argues that the facts of this case are analogous to the "narrow alternative" recognized by this Court in *In re Siler*, "which denied dismissal where Chapter 13's treatment of retirement contributions and plan-loan repayments would leave unsecured creditors nothing despite an unrebutted Chapter 7 presumption." Amended Response at 5; *see In re Siler*, 426 B.R. at 176–78. In *Siler*, the Court considered what would happen if a "hypothetical Chapter 13 plan would not pay a distribution to unsecured creditors," and found that in such a circumstance, "several courts have declined to dismiss a Chapter 7 case based on a Means Test violation." *In re Siler*, 426 B.R. at 177 (citing *In re Skvorecz*, 369 B.R. 638 (Bankr. D. Colo. 2007); *In re Mravik*, 399 B.R. 202 (Bankr. E.D. Wis. 2008)). The debtor in *Siler* argued that Congress intended the Means Test to "restrict Chapter 7 relief to debtors who cannot afford to make payments to unsecured creditors in Chapter 13." *Id.* (citing *In re Mravik*, 399 B.R. at 213; 151 CONG. REC. S2459, S2468–70 (daily ed. Mar. 10, 2005) (Statement of Sen. Hatch)). In *Siler*, the debtor further argued that applying the Means Test produced an absurd result because her 401k loan payments and pension contributions would be excluded from disposable income in a Chapter 13 case, resulting in her net monthly income being negative, and her unsecured creditors recovering nothing in a Chapter 13 bankruptcy case. *Id.* at 176–77. The debtor in *Siler* had an annualized current monthly income of $58,653.60, which "exceeded the applicable median family income ($38,794

per year for a North Carolina Household size of 1)."[24] *Id.* at 170. *Siler* treats section 707(b)(2) as "mandatory, but views this circumstance to cause an absurdity excusing compliance with an otherwise unambiguous statute." *Id.* at 177 n.12.

37. In *Siler*, the Court determined that it was "obliged to enforce the [means] test unless (1) 'literal application of the statutory language at issue results in an outcome that can truly be characterized as absurd . . .' or (2) if 'literal application of the statutory language at issue produces an outcome that is demonstrably at odds with clearly expressed congressional intent.'" *Id.* at 176 (quoting *In re Sunterra Corp.*, 361 F.3d 257, 265 (4th Cir. 2004)). Ultimately, the Court allowed Siler to continue under Chapter 7 given "these rather unusual facts," reasoning that using the Means Test to force a debtor out of Chapter 7 "who could not pay unsecured creditors in Chapter 13 and who, as a matter of clear congressional election would not be required to do so, is absurd and contrary to the purpose of the Means Test." *Id.* at 171, 177.

38. A recent decision from the Eastern District of Virginia describes *Siler* as a "middle ground" in its treatment of whether section 707(b)(2) is mandatory or discretionary with the result that "in most cases, § 707(b) requires a court to dismiss a case where the debtor does not rebut the presumption of abuse unless doing so would create an absurd result." *Malloy*, 2026 WL 2909529, at *9 (E.D. Va. Sept. 28, 2026) (citing *In re Siler*, 426 B.R. at 173, 176–77). As *Malloy* discusses, the Fourth Circuit has not provided clear guidance as to whether a court must dismiss a case that fails to rebut the presumption of abuse. *Id.* at *8–9 ("Indeed, in two published opinions issued only several months apart, the Fourth Circuit provided—in dicta—seemingly inconsistent views on this issue.")[25] As a result, courts throughout the Fourth Circuit have taken different approaches.

[24] The median family income for a household of one in North Carolina in *Siler* was measured at the time *Siler* was decided—2010. *Id.* at 170.

[25] In the first case, the Fourth Circuit "affirmed the bankruptcy court's dismissal of a Chapter 7 case as presumptively abusive" and discussed the failure to rebut the presumption as *permitting* the court to dismiss the

*Compare Gallagher v. Cohen*, 659 B.R. 57, 66–68 (D. Md. 2024) (finding dismissal to be mandatory when a case fails to rebut the presumption of abuse) *and In re Alther*, 537 B.R. 262, 270 (Bankr. W.D. Va. 2015) (same), *with In re Jenkins*, No. 12-50413, 2012 WL 2564901, at *2–3 (Bankr. W.D.N.C. July 2, 2012) (finding dismissal to be permissive but not mandatory when a case fails to rebut the presumption of abuse) *and Malloy*, 2026 WL 2909529, at *9 (same).

39. The court's reasoning in *Malloy* echoes *Siler* in many ways. The United States District Court for the Eastern District of Virginia considered the plain meaning of § 707(b), noting that "the word 'may' in a statute '*clearly* connotes discretion.'" *Malloy*, 2026 WL 2909529, at *9 (quoting *Bouarfa v. Mayorkas*, 604 U.S. 6, 13–14 (2024) (emphasis in original)). The analysis then focuses on whether a mandatory reading of § 707(b) would create an absurd result and found that it would because *Malloy*, like *Siler*, concerned "rather unusual facts" and dismissing or converting the case to Chapter 13 "could virtually eliminate the chances that [the debtor's] creditors could recover." *Id.* at *10–11 (first quoting *In re Siler*, 426 B.R. at 171).

40. While the Court in *Siler* sought to address an unusual situation in which the creditors of a Chapter 7 debtor would not be repaid at all if the case were converted to Chapter 13, courts must also consider the facts of each case individually especially as it relates to a debtor's likelihood of improvement in their financial situation during the course of a Chapter 13 plan. Under a Chapter 13 plan, creditors receive any unexpected upside because "a substantial change in the debtor's financial condition after confirmation may warrant a change in the level of payments." *In re Arnold*, 869 F.2d 240, 241 (4th Cir. 1989). Thus, "debtors must, for the prescribed life of the

---

case. *Malloy*, 2026 WL 2909529, at *8 (citing *Calhoun v. U.S. Trustee*, 650 F.3d 338, 340–42 (4th Cir. 2011)). "Notably, the *Calhoun* court did not state that § 707(b) *required* the bankruptcy court to dismiss such a case." *Id.* In the second case, the Fourth Circuit "considered whether a bankruptcy court's decision denying a § 707(b) motion to dismiss was final and appealable under 28 U.S.C. § 158(a)." *Id.* at *9 (citing *McDow v. Dudley*, 662 F.3d at 284). Unlike the permissive language in *Calhoun*, however, "this time [the Fourth Circuit stated] that once the presumption of abuse is triggered, the case '*must be dismissed unless the debtor can show special circumstances*.'" *Id.* (quoting *McDow*, 662 F.3d at 288) (emphasis in original).

plan, run the gauntlet of exposure to trustee or creditor requests to increase payments." *In re Filion*, 452 B.R. 329, 334 (Bankr. D. Mass. 2011) (quoting *In re Fridley*, 380 B.R. 538, 544 (B.A.P. 9th Cir. 2007)).

**i. The Debtor's Monthly Disposable Income After Qualifying Exclusions**

41. The Debtor argues that like the "absurd" result in *Siler*, he would not be able to pay unsecured creditors in a Chapter 13 case. *In re Siler*, 426 B.R. at 177; *see* Amended Response at 18. The Debtor argues that, after the Debtor's retirement contributions and retirement loan repayments are excluded from his disposable income in a Chapter 13 case, his unsecured creditors would not recover anything in a plan. *Id.* The Debtor correctly notes that 11 U.S.C. § 1322(f) excludes qualifying retirement loan repayments from disposable income, and § 541(b)(7) excludes qualifying withheld contributions from property of the estate. 11 U.S.C. §§ 1322(f), 541(b)(7). Currently, the Debtor pays $336 per month in retirement loan repayments for the State Farm Loan, and $447 per month in retirement contributions, which would lead to $738 per month being excluded from the Debtor's disposable income in a Chapter 13 case. *Id.* Based on the Debtor's calculations in the Schedules along with the Bankruptcy Administrator's correction, the Debtor's monthly disposable income is $461.21. Motion to Dismiss at ¶ 10; Amended Response at 18. The Debtor argues that because the $738 exclusion is greater than $461.21, unsecured creditors would receive nothing in Chapter 13 while the Debtor is repaying the State Farm Loan for thirty-eight months. *Id.* The Debtor's argument that creditors would not recover more in a Chapter 13 than they would in a Chapter 7 case is also predicated upon the $10,000 that the Debtor's counsel is currently holding in a trust. The Debtor argues that "the proposed $10,000 settlement with the Chapter 7 trustee is the measure of what creditors receive in this case [and a] Chapter 13 plan

would have to pay unsecured creditors at least that amount, and on these figures it could pay them little more." Amended Response at 19.

42. Therefore, the Debtor reasons that if creditors would not receive more in a Chapter 13 case, then the *Siler* exception applies and the Debtor's Chapter 7 case would escape the § 707(b)(2) presumption of abuse. *Id.* But here, as discussed above, it is uncertain what exactly creditors would receive in a Chapter 13 plan given the Debtor's income has been increasing year over year.[26] It is possible that the creditors in a Chapter 13 plan, benefiting from any future increases to the Debtor's income, would receive more than the $10,000 set aside in the settlement with the Chapter 7 Trustee. Furthermore, any revisions to the Debtor's budget that decrease expenses would also inure to the benefit of creditors. If this case is converted to Chapter 13, then creditors' recovery could exceed $10,000 if the Debtor's financial circumstances change or when the Trias Family's spending decreases.[27] While the Debtor makes compelling arguments, such arguments rely on this Court's acceptance of the Debtor's underlying budgetary calculations and on this Court's recognition of both of the Debtor's alleged special circumstances. Ultimately, the Court need not make a determination of whether this case is an abuse under § 707(b)(2)(B) or, alternatively, whether this case fits into the *Siler* exception, because the Court must also conduct a separate analysis under § 707(b)(3), the totality of the circumstances test.

**B. Totality of Circumstances**

43. Even if the presumption of abuse is rebutted under section 707(b)(2), a bankruptcy case may still be an abuse of Chapter 7 under the totality of the circumstances analysis in 11 U.S.C.

[26] It should be noted that the Trias Family's annual income is higher than the median for a family of their size in North Carolina. The Debtor's gross income for 2024 was $124,118, and his gross income for 2025 was $141,614. While the Trias Family's gross income is less clear, it was around $180,000 for 2024, at least $177,00 for 2025, and their projected gross income for 2026 is $185,484.

[27] Additionally, after the Agency closes, Mrs. Trias will be able to seek employment in the insurance field without restriction. And while the date of the Agency closure is uncertain, it is certain that it will cease operations by the end of 2027, which is only fifteen months away.

§ 707(b)(3). The totality of the circumstances analysis ensures that the bankruptcy process is fair to creditors by not allowing debtors to shirk their obligations. *In re Walsh*, 287 B.R. 154, 158 (Bankr. E.D.N.C. 2002). This aligns with Congress's intent in passing BAPCPA to "ensure debtors with the ability to repay their debts do so." *In re Dowleyne*, 400 B.R. 840, 846 (Bankr. M.D. Fla. 2008). When analyzing totality of the circumstances pursuant to § 707(b)(3), courts base their analysis on several factors, commonly referred to as the *Green* factors, including but not limited to:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and
> (5) Whether the petition was filed in good faith.

*In re Green*, 934 F.2d 568, 572 (4th Cir. 1991). While these factors pre-date BAPCPA, "[s]everal Bankruptcy Courts in the Fourth Circuit . . . have found *Green* to continue to be instructive." *In re Campbell*, No. 15-13426-BFK, 2016 WL 4150663, at *9 (Bankr. E.D. Va. Aug. 3, 2016).[28]

44. Last year, the Eastern District of North Carolina analyzed the *Green* factors to determine if a case was an abuse of Chapter 7 under totality of circumstances analysis pursuant to § 707(b)(3). *See In re Clark*, 2025 Bankr. LEXIS 3109, at *36–49. In *Clark*, the debtors reported going on nine trips within the year prior to filing for bankruptcy. *Id.* at 7.[29] During the six-month

---

[28] Citing *In re Matthews,* No. 13–10521–BFK, 2013 WL 13852221, *8 (Bankr. E.D. Va. April 3, 2013); *In re Christians,* No. 12–00819–8–SWH, 2012 WL 4846538, at *3 (Bankr. E.D.N.C. Oct. 10, 2012); *In re Sonntag,*, 2012 WL 1065482, at *3; *In re Bogart,* No. 11–19089–BFK, 2012 WL 3913093, at *2 (Bankr. E.D. Va. Sept. 7, 2012), *aff'd*, Case No. 1:12–cv–1195–GBL–JFA (E.D. Va. 2013); *In re Crawley,* 412 B.R. 777, 785 (Bankr. E.D. Va. 2009) (stating that "the court believes that the factors identified in *Green* remain relevant considerations").

[29] While "Mr. Clark characterized [the trips] as less extravagant than in earlier years, [these trips] include[ed] vacations in Kissimmee and St. Augustine, Florida in March 2024; Wilmington, North Carolina in May 2024; Daytona Beach, Florida in May 2024; Carolina Beach/Wilmington in June 2024; Brevard, North Carolina in August 2024; Oak Island, North Carolina in October 2024; Miami Beach, Florida in October 2024; Banner Elk, North Carolina in February 2025; and Great Wolf Lodge in Concord, North Carolina, in March 2025." *Id.*

lookback period prior to filing for bankruptcy, from October 12, 2024, to March 18, 2025, the Clark debtors spent $2,628.51 on traveling, and their "recurring expenses . . . included water delivery; a Wild Alaskan, Inc. seafood subscription service; alcohol purchases . . . [;] Gymnastics events involving the Clarks' children; concert tickets; purchases at Best Buy; and maintenance services for a hot tub; as well as the $330 monthly membership fee for the Freedom Boat Club." *Id.* at *8. The Clark debtors' monthly expenses also included their children's private school tuition, which was $817 per child per month, or $2,451 total per month, from May 2024 through December 2024. *Id.* at *36.

45. Under the § 707(b)(3) totality of the circumstances analysis, the Eastern District of North Carolina focused on the third, fourth, and fifth *Green* factors. *Id.* at *36–49. Specifically, for the third *Green* factor, the court analyzed whether the debtors' proposed budget was excessive or unreasonable. *See id.* at *36. The court identified that the debtors paid for their three children to attend private school, totaling $2,451 per month, with no evidence that "private school was necessary for their children other than Mr. Clark's stated negative opinion of the public schools in his area," and found that this expense was not reasonably necessary. *Id.* at *36–37, 41. The court also stated that "the BA identified a number of items that, taken collectively, constitute luxury expenses." *Id.* at 41. Ultimately, the court in *Clark* concluded that the debtors "demonstrate[d] an unwillingness to tighten the budget" that was "not consistent with the goal of the Bankruptcy Code to provide a fresh start to the truly needy." *Id*. at *42–43. Furthermore, "[a]llowing the Clarks to proceed in chapter 7 without any effort to reduce these expenses is the equivalent of their financing these activities at the expense of unsecured creditors." *Id.* Based on this analysis, as well as an analysis of the fourth and fifth *Green* factors, the court determined that the totality of circumstances demonstrated abuse of Chapter 7 of the Bankruptcy Code. *Id.* at *49.

46. Here, the first *Green* factor does not apply in this case because no evidence presented suggests that the Debtor filed bankruptcy due to a "sudden illness, calamity, disability, or unemployment." *In re Green*, 934 F.2d at 572. Furthermore, the fourth and fifth *Green* factors do not apply in this case because the Debtor and Mrs. Trias have demonstrated honesty and integrity throughout the course of the Debtor's bankruptcy case. Thus, the Court only analyzes the second and third *Green* factors in its § 707(b)(3) totality of the circumstances analysis.

**i. The Debtor Has Made Consumer Purchases Far in Excess of His Ability to Repay**

47. The second *Green* factor is whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay. *See In re Green*, 934 F.2d at 572. A debtor's ability to repay for purposes of the second *Green* factor is evaluated based on the "debtor's reasonable expectation of repayment when the debt was incurred." *In re Sonntag*, 2012 WL 1065482, at *6. Furthermore, "[p]ost-petition changes to a debtor's financial circumstances—such as future income, expenses, and financial intentions—are essential to a determination of a debtor's 'financial situation' as stated in § 707(b)(3)(B), and unlike the analysis regarding abuse pursuant to § 707(b)(2), a totality of the circumstances test is not a 'snapshot' examination." *Id.* at *4.[30] A Court may consider whether a Debtor's frivolous spending continued post-petition. *See In re Pennington*, 348 B.R. 647, 651 (Bankr. D. Del. 2006) (In reference to considerations of changes

[30] *See also In re Schwendt*, 669 B.R. 566, 570 (Bankr. N.D. Fla. 2025) ("In assessing the totality of the circumstances under § 707(b)(3)(B), courts properly consider changes in a debtor's finances that occur post-petition." (citing *In re Henebury*, 361 B.R. 595, 607–10 (Bankr. S.D. Fla. 2007); *In re Cortez*, 457 F.3d 448 (5th Cir. 2006) (holding that a court may act on the basis of any development occurring before the discharge is granted); *Ng. v. Farmer*, 477 B.R. 118 (B.A.P. 9th Cir. 2012); *In re Parada*, 391 B.R. 492, 501 (Bankr. S.D. Fla. 2008) (holding that in inquiry under 11 U.S.C. § 707(b)(3)(B), a court can and may consider post-petition circumstances that occur prior to the hearing on the motion to dismiss); *In re Pennington*, 348 B.R. 647, 650 (Bankr. D. Del 2006) (deciding that post-petition changes in debtor's expenses can be properly considered in the U.S. Trustee's motion to dismiss under 11 U.S.C. § 707(b)(3)(B)); *In re Dowd*, 607 B.R. 833, 837 (Bankr. E.D. Va. 2019) (citing *In re Polinghorn*, 436 B.R. 484, 487–88 (Bankr. N.D. Ohio 2010) ("[P]ost-petition changes to a debtor's income and expenses, as well as a debtor's future intentions, while possibly relevant to a determination of abuse under § 707(b)(3), are not taken into consideration when determining whether the granting of relief should be deemed to be presumptively abusive for purposes of § 707(b)(2).")).

to the Debtor's expenses, the court "conclude[d] that it must consider the Debtor's financial condition at the time of the hearing on the motion to dismiss in determining whether granting chapter 7 relief is an abuse under section 707(b)(3)."). A court should evaluate "a debtor's ability to repay consumer purchases and cash advances . . . from the debtor's reasonable expectation of repayment when the debt was incurred" rather than "[s]imply looking to the temporal proximity of the purchases to the petition date without more evidence about the nature and reasonableness of the purchases." *In re Sonntag*, 2012 WL 1065482, at *6 (citing *In re Vansickel,* 309 B.R. 189, 211 (Bankr. E.D. Va. 2004)).

48. Here, the Bankruptcy Administrator raised concerns about the Trias Family's high spending on dining and numerous vacations during Mrs. Trias's Bankruptcy, the Lookback Period, and post-Petition. When examining just the expenditures from the beginning of the Lookback Period (October 2025) to now (October 2026), the Debtor has used the period of not repaying debts to make a high number of excessive consumer purchases. The Trias Family spent approximately $7,569.73 during the Lookback Period on vacations. They even went on a Caribbean cruise during Mrs. Trias's Bankruptcy, which cost over $7,427.39, and possibly as much as $8,227.39, the equivalent of more than 60 monthly Chapter 13 plan payments at Mrs. Trias's proposed and failed repayment plan rate of $120 per month. While the *Clark* court did not analyze the second *Green* factor, the court characterized the debtors' high spending on travel (among other expenditures) as inappropriate and an abuse of Chapter 7. Yet in the *Clark* case, the debtors' total vacation spending for a family of five during the lookback period of October 12, 2024, to March 18, 2025, was $2,628.51, far below the Trias Family's spending in this case of $7,569.73 from October 1, 2025, to March 31, 2026. *See In re Clark*, 2025 Bankr. LEXIS 3109, at *8. Furthermore, during the Lookback Period, the Trias Family spent an average of (1) $1,266.25 per month on dining out,

with a total average monthly food budget around $2,161.87 per month (though this total also includes gas expenses), (2) $532.50 on personal services, (3) $333.17 per month on recreation, and (4) $2,187.97 per month on shopping. Even in August 2026, the month prior to the Hearing, the Trias Family spent $2,199.98 on dining out, $312.58 on personal services[31], $778.97 on recreation, and $1,351.91 on shopping. BA Ex. E.

49. The Trias Family was capable of spending so frivolously because they did not make any efforts to pay creditors. The Trias Family sustained their spending on traveling, dining out, personal services, and shopping by not paying their debts. The Debtor testified that they generally stopped paying their unsecured debt during Fall 2024, and Mrs. Trias testified that they ceased paying all debts when she entered bankruptcy on August 31, 2025. By the time the Debtor filed for bankruptcy on April 30, 2026, three lawsuits had been filed against him, and the Debtor had not paid his student loans since the fall of 2024. On June 9, 2026, the Debtor and Mrs. Trias entered into a Loan Modification for their Mortgage, at which time they were behind by at least $24,587.98. In sum, the Trias Family has not been paying their debt service for around two years as of the date of the Hearing.

50. At the Hearing, the Bankruptcy Administrator questioned the Debtor regarding his family's expenses, to which the Debtor responded that they have "definitely not" done the best that they can do, but that they are working on it. Hr'g Tr., Sept. 16, 2026. The Bankruptcy Administrator also questioned Mrs. Trias about the Trias Family's expenses, asking if the Trias Family cut back on dining out at all. *Id.* Mrs. Trias answered, "We tried." *Id.* The Debtor and his family have struggled with debt for years, yet even after Mrs. Trias's Bankruptcy, they have continued to make consumer purchases beyond what they can afford. The second *Green* factor

[31] As an example of the excessive expenditures, the Trias Family spent $209.95 at a day spa on a trip to Savannah, Georgia in August 2026.

weighs in favor of this case being an abuse of Chapter 7 under the totality of the circumstances because the Trias Family have continued to make consumer purchases far in excess of their ability to repay.

**ii. The Debtor's Proposed Family Budget Is Excessive and Unreasonable**

51. The third *Green* factor addresses whether the debtor's proposed family budget is excessive or unreasonable. This factor focuses on the reasonableness of the Debtor's family budget because "[c]ourts expect that 'the budgeted expenses of a debtor seeking relief under the Bankruptcy Code would reflect some belt tightening—some reduction from prepetition levels.'" *In re Ellison*, 663 B.R. 743, 748 (Bankr. E.D. Mo. 2024) (quoting *In re Reeves*, 327 B.R. 436, 446 (Bankr. W.D. Mo. 2005)). As recounted in *Clark*, other bankruptcy courts have assessed the third *Green* factor by considering whether certain expenses are reasonably necessary. *See In re Stout*, 336 B.R. 138, 143 (Bankr. N.D. Iowa 2006) (holding that expenses of $700 per month for home schooling and $500 per month for skating for the debtor's child were not reasonably necessary); *In re Schott*, No. 05-49765-293, 2007 Bankr. LEXIS 1027, at *4 (Bankr. E.D. Mo. March 23, 2007) (holding that expenses of $650 per month life insurance premiums, $505 per month school tuition for debtors' children, and $158 per month for soccer camp for the children were not reasonably necessary); *In re Ellison*, 663 B.R. at 748 (holding that expenses of $270 per month for taekwondo classes and $194.40 per month for a gym membership for the debtor and her family were not reasonably necessary).

52. Under the third *Green* factor, the Trias Family's budget includes high levels of discretionary spending and they have not significantly reduced their spending since the Debtor filed for bankruptcy. The Bankruptcy Administrator first noted that Debtor was unable to pay his attorney in full prior to filing for bankruptcy; however, the frivolity of the Trias Family's excessive

spending seems to indicate otherwise.[32] Beyond the excessive spending on consumer goods and services and discussed herein, the Bankruptcy Administrator argues that the Debtor's spending on life insurance is unreasonable. During the course of the bankruptcy, the Debtor continues to spend $807 a month on life insurance premiums for six life insurance policies. The Trias Family contend that they cannot stop payment on the life insurance premiums without losing thousands of dollars in accrued value in any subsequent liquidation. The Trias Family emphasizes that they have already liquidated two policies, although this was prior to the Debtor filing for bankruptcy. While not determinative of this Court's analysis of the third *Green* factor, the United States Bankruptcy Court for the Eastern District of Missouri previously held that spending $650 per month on life insurance premiums was not reasonably necessary. *See In re Schott*, 2007 Bankr. LEXIS 1027, at *9–10. The court in *Schott* also held that continuing to contribute a life insurance policy that operates as a savings device is not a reasonably necessary expense. *Id.*[33] Mrs. Trias acknowledged at the Hearing that their life insurance policies operate as savings devices to plan for their financial future because she only has $1,000 in her 401k. As a result, even though the Trias Family's spending on life insurance premiums is high, the reasonableness of the insurance premium payments is less clear given that Mrs. Trias's limited retirement savings.

53. More dispositive than the life insurance policies is the budget's incorporation of the Trias Family's excessive spending on food, travel, and recreation, all to the detriment of their

[32] The Trias Family's average monthly Starbucks expense during the Lookback Period was $123.21, which means that for months, the amount the Trias Family spent monthly on Starbucks would cover the amount of Mrs. Trias's proposed and failed monthly Chapter 13 plan payments. When looking at the Trias Family's post-petition spending, none of this appears to have changed their spending.

[33] "[T]he premium on a term life insurance policy that reasonably provides for the debtor's dependents by replacing debtor's income in case of debtor's death is a reasonably necessary expense. However, the portion of the premium applied to increase the cash value of a whole life policy is simply a savings device and is not a reasonably necessary expense." *In re Schott*, 2007 Bankr. LEXIS 1027, at *9–10 (citing *In re Leung*, 311 B.R. 626, 631 (Bankr. S.D. Fla. 2004); *In re DeRosear*, 265 B.R. 196, 211 (Bankr. S.D. Iowa 2001); *In re Heffernan*, 242 B.R. 812, 817 (Bankr. D. Conn. 1999)).

creditors. During the Lookback Period, the Trias Family spent a total of $7,597.51 dining out, $3,195.00 on personal services, $1,999.01 on recreation, $13,127.84 on shopping, and $7,569.73 on travel. BA. Ex. D. Constraining themselves to only reasonably necessary expenses would generate sufficient funds for the Trias Family to meaningfully repay a portion of the debt to their creditors, especially considering the Trias Family's above median annual income.

54. As their August 2026 spending indicates, the Trias Family has continued to spend near pre-petition levels—with August 2026 spending totaling $5,113.17, and average monthly spending during the Lookback Period totaling $5,604.02. *Compare* BA Ex. E *with* BA Ex. G. At the Hearing, the Debtor and Mrs. Trias both testified that they were working on cutting back and reducing their budget; however, Mrs. Trias filed for bankruptcy on August 31, 2025, and the evidence demonstrates that the Trias Family has failed to cut back in any meaningful way during the past year. Instead, the Trias Family continued to go on vacations during the Lookback Period, including a trip to Charleston the same month that Mrs. Trias filed for bankruptcy and a Caribbean cruise costing between $7,327.39 and $8,227.39 the next month. BA Ex. D. The Trias Family also continued to engage in high spending on dining, with an average monthly expense of $1,266.25 on dining out during the Lookback Period not inclusive of the cost of groceries. *Id.* During the Lookback Period, the Trias Family also incurred average monthly expenses of $532.50 on personal services, $333.17 on recreation, and $2,187.97 on shopping (which likely also encompassed some household expenses). *Id.* Even in August 2026, the month prior to the Hearing, the Trias Family spent $2,199.98 on dining out, $312.58 on personal services[34], $778.97 on recreation, and $1,351.91 on shopping. BA Ex. E. Therefore, under the third *Green* factor, the Debtor's family budget is excessive and unreasonable.

[34] As an example of the excessive expenditures, the Trias Family spent $209.95 at a day spa on a trip to Savannah, Georgia in August 2026.

55. Since August 31, 2025, either the Debtor or Mrs. Trias has been in bankruptcy in this district. While the Debtor and Mrs. Trias both state that they are working on trimming their budget, they have had over a year to reduce their expenses and as the discussions of their expenses above indicate, they have failed to do so. The Trias Family have not engaged in the level of "belt tightening" necessary to achieve "some reduction [in spending] from prepetition levels.'" *In re Ellison*, 663 B.R. at 748. The Debtor's failure to appropriately live within a reasonable budget is to the detriment of creditors, who should receive the available funds once the budget is limited to what is reasonably necessary. The Trias Family's continued spending beyond their above-median income leaves the Court lacking in confidence that the Trias Family are "the truly needy" who simply solicit temporary relief in order to enjoy "a fresh start." *In re Clark*, 2025 Bankr. LEXIS 3109, at *43. Thus, the third *Green* factor weighs in favor of this case being an abuse of Chapter 7 under pursuant to § 707(b)(3) and the Fourth Circuit's totality of the circumstances test.

**C. Conclusion**

56. In conclusion, this case is about a family with an above-median income confronting financial conditions that have changed and failing to acclimate to new financial realities. There is no question that the Debtor and his family are going through a difficult time in their lives, and the Court deeply appreciates the Debtor and Mrs. Trias testifying at length with vulnerability and honesty about their life circumstances. Although that truthfulness is deeply appreciated, the Court must honor its duty to uphold the integrity of the bankruptcy system by deciding this case based on the Bankruptcy Code. Although the parties stipulated to the presumption of abuse under § 707(b)(2), and the parties focused part of their arguments on the Debtor's proposed special circumstances under § 707(b)(2)(B) rebutting the presumption of abuse and the *Siler* exception, the Court need not rule on this part of § 707, given the totality of the circumstances analysis is a

wholly separate basis for finding abuse. Under 11 U.S.C. § 707(b)(3), the totality of the circumstances indicate that under the second *Green* factor, the Debtor's consumer purchases are far in excess of his ability to repay, and under the third *Green* factor, the Debtor's budget is excessive and unreasonable with a failure to reduce spending from pre-Petition levels. Accordingly, this case is a clear abuse of Chapter 7 under the totality of the circumstances pursuant 11 U.S.C. § 707(b)(3).

**WHEREFORE**

1. Accordingly, the Bankruptcy Administrator's Motion to Dismiss is hereby **GRANTED**.
2. The Debtor has 30 days from the entry of this Order to convert the case to one under Chapter 13, or the case will be **DISMISSED**.
3. The Court will grant the Trustee's Motion to Approve Settlement. Subsequently, the $10,000 that the Debtor's counsel is currently holding in a trust will be first be used to pay the Chapter 7 administrative expenses, and any remainder shall be transferred to the Chapter 13 Trustee upon conversion or returned to the Debtor upon dismissal.

**IT IS SO ORDERED.**

**This Order has been signed electronically. The Judge's signature and Court's seal appear at the top of this order.**

**United States Bankruptcy Court**